**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-CV-02132-WYD-MEH

MHARIEL SUMMERS,

     Plaintiff,

v.

GREEN RIVER CORPORATION, a Colorado Corporation,

     Defendant.

---

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM IN SUPPORT THEREOF**

---

Plaintiff Mhariel Summers ("Ms. Summers" or "Plaintiff"), with the assistance of undersigned counsel, hereby responds to Defendant's Motion For Summary Judgment And Memorandum In Support Thereof.

## I. INTRODUCTION

Summary judgment is inappropriate in this case because the Defendant's legitimate business reason for demoting Ms. Summers is at issue. Defendant points to store performance as justification for demoting Ms. Summers; however, there is no agreement within Green River about which metrics are important in determining store performance. There is a dispute over the reason for Ms. Summers' demotion from store manager to manager in training, and disparate treatment is evident upon examination of the company's treatment of other employees compared to Ms. Summers.

1

## II. FACTS

A.  Response to Movant's Material Facts ("MMF")

Plaintiff does not dispute 1-55, 57-59, 61-74, 76-93, 95, or 97-127.  Though these facts are undisputed, Defendant omits critical contextual information contained in Plaintiff's Statement of Additional Material Facts.

Plaintiff disputes MMF #56, because this is a conclusion that does not exist in the record.

Plaintiff disputes MMF #60, because the record does not support this allegation. Additionally, see PF #33-36, *infra.*

MMF #75 is Defendant's proffered legitimate justification for the adverse action at issue, but Plaintiff disputes the truth of this statement based on PF #1-72, *infra.*

MMFs #94 and 96 are related to corporate decisions about available positions at Mr. Sayers' store.  These statements are contradicted by PF# 67-70, *infra.*, which explain that Ms. Summers was denied the Associate Manager position (which would have reduced the financial impact of her demotion), and a white male was later given that position.

B. Statement of Additional Material Facts ("PF")

1.     Because it was a franchise, Green River did not train employees on discrimination laws, even though Aaron's did not provide that training to franchisee employees.  Ex. 2, Ford Bohannon Dep. Excerpts, p. 19:13-23:14.

2.     Green River doesn't discuss discrimination, because it has never "pop[ped] up." Ex. 2, p. 20:18-21.

3.     Mr. Bohannon has had casual training on discrimination, but no formal training; he understands that discrimination is not acceptable.  Ex. 2, pp. 18:16-19:10.

4.     Mr. Bohannon leaves Human Resources responsibilities up to Ms. West, his office manager; he hired her without asking what type of HR experience she had, if any.  Ex. 2, pp. 17:15-18:15.

5.     Mr. Bohannon relied on Mr. Plummer and Mr. Johnson to make sure that no discrimination was happening because Mr. Bohannon was 1500 miles away. Ex. 2, p. 20:7-17.

6.     Mr. Plummer's last training on equal employment laws was in 2004. Ex. 3, Ian Plummer Depo. Excerpts, pp. 24:6-8, 26:8-11.

7.     Mr. Johnson received all of his training about equal employment laws in college and at a former employer before 2002. Ex. 4, Steve Johnson Dep. Excerpts, pp. 46:24-48:13.

8.     Mr. Lovett recieved training about equal employment laws at Conoco, Petro, EZCORP, and when he ran his own collections agency, he provided training for his employees. Ex. 5, Jerry Lovett Dep. Excerpts, pp. 29:13-15, 30:19-31:3.

9.     In 2014 and 2015, even though there wasn't a lot of training on equal employment laws, employees of Green River knew better than to say racist or sexist things out loud.  Ex. 6, Jeff Sayers Dep. Excerpts, pp. 96:19-97:6.

10.     Ms. Summers is an African American lesbian.  Ex. 7, Mhariel Summers Dep. Excerpts, p. 136:15-16.

11.     Ms. Summers does not have a conventional look and is considered more masculine. Ex. 8 Photos of Mhariel Summers, Ex. 7, p. 135:16-24.

12.     Sometimes customers would mistake Ms. Summers for a guy, and instead of correcting them, she would just go with it.  Ex. 6, p. 68:2-8.

13.     Ms. Summers does not present in a feminine manner; she was described as "less feminine" than other women in similarly situated positions. Ex. 3, pp. 223:14-225:1l; Ex. 4, pp. 52:18-53:10; Ex. 6, pp. 67:20-68:18; Ex. 7, p. 29:10-12.

14.     Ms. Summers always dressed within the dress code parameters, but she did not dress the same way that Ms. Rodriguez and Ms. Guilliaume did.  For instance, Ms. Summers wore black basketball shoes instead of women's dress shoes.  Ex. 6, p. 68:13-23.

15.     When asked to explain why he felt that Ms. Summers presented as less feminine, Mr. Plummer only noticed that her hair was shorter.  He denies observing any differences between the female General Managers ("GMs") as far as clothing, makeup, or voice.  Ex. 3, pp. 224:8-225:1.

16.     Mr. Plummer doesn't know why there aren't more women working in this business. Ex. 3, pp. 227:2-228:9.

17.     Within weeks of her employment with Defendant, Ms. Summers was promoted to GM of Store #256.  Ex. 7, p. 341:17-21.

18.     Mr. Plummer was not part of the hiring process when Ms. Summers was hired or promoted.  Ex. 7, p. 11-13.

19.     She performed her job duties well and got along with her employees and customers.  Ex. 6, p. 42:2-9.

20.     She remained as a GM of Store #256 for approximately a year and a half, from September 2013 until February 2015. Ex. 9, Key Documents at GREEN RIVER_512, 530.

21.     During that time, her annual salary increased from $45,000 to $62,000, and she received a $7,000 performance-based bonus.  Ex. 9 at GREEN RIVER_512, 535; Ex. 7, p. 48:21-23.

22.     Mr. Plummer was promoted from the Regional Accounts Manger to District Regional

Manager in January 2015, and his interactions with Ms. Summers increased due to his changes in

duties.  Shortly thereafter, he recommended demoting Ms. Summers six weeks later on

approximately February 24, 2015.  Ex. 3, pp. 41:8-16, 44:13-21; Ex. 9 at SUMMERS_156.

23.     Ms. Summers had a reputation of being very hard working.  When she got the GM

position at Store #256, her colleagues were concerned for her because she was thrown into it

without a lot of training.  Ex. 6, 15:13-20.

24.     Store #256 was "the death of a lot of GMs," so it was hard to fill that position; not many

people were qualified or wanted the job.  Ex. 6, 15:21-16:5.

25.     Store #256 has never been a performing store, partially because it is smaller, with

limitations as far as how much product it can hold.  Ex. 6, 17:6-18:7.

26.     Mr. Sayers was worried that Ms. Summers was being placed in a difficult situation at

Store #256.  Ex. 6, 16:19-25.

27.     Other new GMs got weeks of training, but Mr. Johnson only permitted Mr. Sayers to

spend three days with Ms. Summers. Ex. 6, pp. 15:15-16:13, 31:1-32:5.

28.     Mr. Sayers felt that Ms. Summers had a good run at Store #256.   Ex. 6, 17:1-18:7.

29.     Expenses allocated to the stores increased in 2014. Def's Bohannon Decl. 7.

30.     In 2015, Ms. Summers was 100% over gap, which was difficult to accomplish, and she

deserved a huge kudos for her charge-offs being so low.  Ex. 6 37:9-39:5, Ex. 9 at

SUMMERS_151-154.

31.     For performance in January 2015, Ms. Summers' store was ranked third in the Western

Region overall. Ex. 9 at SUMMERS_152.

32.     In January 2015, Ms. Summers exceeded expectations of the company and began to return the store to a high profit level. Ex. 6, 37-39.

33.     During litigation, Defendant has claimed that pretax profit was an important "driver in Green River's Business." Ex. 4, pp. 110-111

34.     Mr. Plummer believes that meeting profit was the most important responsibility for a GM but cannot remember how Ms. Summers was "doing on profit." Ex. 3, pp. 184:7-12, 187:16-17.

35.     Store managers were never informed that pretax profit was as important as Defendant now alleges; they measured success in other ways. Ex. 5, pp. 53:18-54:5, 54:25-55:24; Ex. 7, pp. 38:16-39:5, 141:13-25.

36.     In litigation, Defendant has characterized Ms. Summers' demotion as justified based on an expectation that she improve her pretax profit in less than six months, while white male store managers, such as RJ Wooten, were given two years to improve profitability. 2 Dec. ¶ 11; Ex. 4, p. 111:6-7; Ex. 6, p. 52:9-13.

37.     The issues raised in the second paragraph of the Associate Counseling Form from February 24, 2015 are not reasons to demote a GM to a Manager-In-Training ("MT").  Def. Ex. B; Ex. 6, 62:10-63:3.

38.     Ms. Summers' demotion was not fair; other people had worse numbers, and did worse things, and either get a slap on the hand or demoted for a short time then promoted.  Ex. 6, 57:1-11.

39.     It was strange that Ms. Summers was demoted to the MT level; this was unusually drastic compared to how other demotions within the company occurred.  Ex. 6, 30:12-24, 32:6-12.

40.     No investigation was conducted into the reasons provided by Mr. Plummer in support of Ms. Summers' demotion.  Ex. 2, p. 75:22-76:11.

41.     When Mr. Plummer demoted Ms. Summers, he told her it was because her deliveries were low and non-renewals were out of line. Ex. 6, p. 11:15-22, 13:10-15:7.

42.     Ms. Summers told Mr. Plummer that she felt she was being demoted because she was Black and a lesbian, and she reiterated her concerns when she tendered her resignation, plus spoke with Mr. Sayers one additional time.  Ex. 6, pp. 75:16-76:9.

43.     Mr. Sayers knew what was happening with GMs because he watched their numbers; the only time he has been surprised about a demotion or termination was regarding Ms. Summers, whose numbers were increasing.  Other than that, he "always saw it coming" because those GMs had declining numbers for a substantial amount of time.  Ex. 6, pp. 72:24-73:17.

44.     In January of 2015, Ms. Summers' store was performing just as well as Mr. Sayers' store, although his was quite a bit bigger with more product.  Ex. 6, 35:19-24; Ex. 9 at SUMMERS_150.

45.     Due to turnover, Ms. Summers' store was understaffed between September and December 2014. Ex. 7, p. 70:21-24.

46.     Defendant alleges that Ms. Summers' store experienced high turnover due to Ms. Summers' "lack of leadership"; however, Mr. Plummer did not conduct exit interviews with Mr. Spencer or Mr. Powell. Ex. 3, p. 217:4-15; Ex. 7, pp. 93:19-95:1, 110:24-111:11.

47.     Mr. Plummer felt there were "no differences in management" between the female GMs but did not criticize the leadership of Ms. Rodriguez and Ms. Guilliaume. Ex. 3, pp. 225:5-226:7

48.     Other GMs were not disciplined for having high charge-offs, though Ms. Summers ultimately was demoted allegedly for this position. Ex. 6, p. 42:6-18

49.     Mr. Sayers had charge off percentages that were worse than Ms. Summers, and he was neither coached nor disciplined for his less than stellar performance.  Ex. 6, 42:6-18.

50.     In December of 2014, Mr. Sayers had to shrink 11 worthless items at Ms. Summers' store, which equaled $357.53— "a drop in the bucket"—in book value.  Ex. 6, 44:2-46:9.

51.     $357.53 in shrink over the course of a year is not something a GM would typically get disciplined for, and "absolutely not" a reason to demote a GM to a MT position.  Ex. 6, 46:10-17.

52.     Compared to Ms. Summers, Ms. Rodriguez had significantly more inventory that had to be shrunk, and Mr. Sayers also had to shrink quite a bit at another location.  Ex. 6, pp. 86:25-87:17.

53.     Every GM has instances where initials are missed in the flow process, and that is not cause for demoting a GM to a MT; "it's not even a close call," and Mr. Sayers missed initialing occasionally.  Ex. 6, 46:18-48:4.

54.     Other GMs were continually counseled for missing initials in the flow process, but without consequence.  Ex. 6, pp. 51:24-52:1.

55.     When Mr. Plummer was searching for all examples of missed initials in Ms. Summers files, he was able to find 10 total; 10 is very minimal.  Ex. 6, p. 51:18-24.

56.     Another GM, RJ Wooten had a reputation for not following the flow process.  Ex. 6, p. 52:9-18.

57.     One of the main focuses from Green River was growing customer count, and Ms. Summers was showing growth in this area at the time of the demotion.  Ex. 6, p. 85:4-14.

58.     Another location, Store #F255 lost 254 customers in 2014 – the most of any of Defendant Green River's locations and far more than Ms. Summers' store - but that GM, RJ Wooten, a white male, was not demoted.  Ex. 6, pp. 58:18-59:12.

59.     Ms. Summers was not given adequate inventory to run a successful lease to own business and was therefore severely disadvantaged compared to other store managers. Ex. 7, pp. 74:21-76:9; Ex. 5, pp. 41:6-8, 43:12-25.

60.     Stores that were more successful received more funding, which allowed those locations to improve their inventory. Stores that were struggling, like Ms. Summers', were not given the same opportunity. Ex. 7, p. 75:15-16.

61.     Concerning inventory, Mr. Plummer did not consider Store #256 to be a priority; he prioritized the larger stores, so sometimes three quarters of Store #256 would be empty and it looked like it was going out of business.  Ex. 5, p. 13:13-14:11.

62.     Mr. Sayers thought that Ms. Summers was treated differently because she is a Black woman.  Ex. 6, p. 96:15-18.

63.     Jerry Lovett is a white male.  Ex. 6, 97:7-12.

64.     Mr. Lovett was known for being demanding and Green River appeased him; when Ms. Summers wanted answers about why Mr. Plummer was treating her differently, she was demoted and cut off.  Ex. 6, p. 97:7-25.

65.     Ms. Summers' performance was not substandard to other GMs. Ex. 6, p. 42:2-6.

66.     Mr. Plummer and Mr. Johnson treated other GMs differently. Ex. 6, p. 63:18-20.

67.     A Customer Account Manager is paid more than a Manager Trainee.  Ex. 6, pp. 32:25-33:4.

68.     A Sales Manager is paid more than a Manager Trainee, and also has a bonus structure. Ex. 6, p. 33:5-11.

69.     Ms. Summers' drastic demotion was "definitely" designed to "encourage her to quit." Ex. 6, p. 64:19-23.

70.     When Mr. Lovett, who was serving as Mr. Sayer's Assistant Manager, was moved to Store #256 to replace Ms. Summers, Mr. Sayers was told not to fill the position, even though he needed the help and there was enough money to pay an Assistant Manager. The position stayed empty until another white man was given the job.  Ex. 6, pp. 82:15-84:21.

71.     Mr. Plummer found Mr. Lovett annoying.  Ex. 6, p. 65:19-24.

72.     Mr. Plummer did not like Ms. Summers; she was demoted so that there was an open position for a white man.  Ex. 6, p. 57:12-16.

73.     Pretty much all the stores were run by white men.  Ex. 6, p. 57:21-58:3.

### III. ARGUMENT

A.      Summary Judgment Standard

Under Fed. R. Civ. P. 56, summary judgment is only appropriate if the pleadings, depositions, documents, and answers to the interrogatories, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). It is the moving party's burden to demonstrate the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Justice v. Crown Cork & Seal Co.*, 527 F.3d 1080, 1085 (10th Cir. 2008). Once the moving party

meets its burden, the burden shifts to the nonmoving party to show that a genuine issue remains for trial with respect to the dispositive matters for which he or she carries the burden of proof. *Nat'l Am. Ins. Co. v. Am. Re-Ins. Co.*, 358 F.3d 736, 739 (10th Cir. 2004); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

The record "must be viewed in the light most favorable" to plaintiff, resolving all ambiguities and drawing all reasonable inferences against defendant. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). All doubts must be resolved in favor of the existence of triable issues of fact. *Boren v. Sw. Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991). A "genuine" factual dispute is one "on which the jury could reasonably find for the plaintiff[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Id.* at 248. This court must disregard evidence presented by defendant that is contradicted, impeached or provided by an interested witness. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

Additionally, summary judgment is not proper for settling issues of intent or motive in employment discrimination actions. *Roemer v. Pub. Serv. Co.*, 911 F. Supp. 464, 468 (D. Colo. 1996). Therefore, a judge should not conduct mini-trial to determine the employer's state of mind in response to a summary judgment motion. *Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995). "The ultimate factual determination of whether the employer's decision was motivated by intentional discrimination based upon protected class characteristics is for the trier of fact." *Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir. 1995).

1.    *Prima Facie* Burden

"To establish a *prima facie* disparate treatment claim, a plaintiff must present evidence

that . . . she suffered an adverse employment action; and [] the adverse action occurred under the circumstances giving rise to an inference of discrimination." *Luster v. Vilsack*, 667 F.3d 1089, 1095 (10th Cir. 2011). "Evidence of an employer's more favorable treatment of similarly-situated employees who are not members of a protected class can provide an inference of discrimination." *Luke v. Hospital Shared Services, Inc.*, 513 Fed. Appx. 763, 765 (10th Cir. 2013). "Similarly situated employees are those who deal with the same supervisor and are subject to the same governing performance evaluation and discipline." *Id.* (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997)). "A court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated." *Aramburu*, 112 F.3d at 1404.

At the *prima facie* stage of the *McDonnell Douglas* analysis, a plaintiff is only required to raise an inference of discrimination, not dismiss the non-discriminatory reasons subsequently submitted by defendant. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973); *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193 (10th Cir. 2000).  The plaintiff does not have the burden of proving that a defendant's proffered reasons were false, or that a discriminatory factor was the "sole" motivating factor in the employment decision. *James v. Sears, Roebuck & Co., Inc.*, 21 F.3d 989, 992 (10th Cir. 1994).  Instead, the plaintiff must show that the discriminatory factor was a reason and that it was the factor that made a difference.  *Id.*

2.	Pretext Law

"A plaintiff can withstand summary judgment by presenting evidence sufficient to raise a genuine dispute of material fact regarding whether the defendant's articulated reason for the

adverse employment action is pretextual." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002). "Pretext exists when an employer does not honestly represent its reasons for terminating an employee." *Miller v. Eby Realty Grp. LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005). "[W]hile rejection of the employer's explanation does not compel a finding of discrimination, 'it is permissible for the [jury] to infer the ultimate fact of discrimination from the falsity of the employer's explanation.'" *Id.* (quoting *Reeves*, 530 U.S. at 147 (2000)). "Such an inference is consistent with the general law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt." *Id.* (internal quotations omitted). "[T]he evidence establishing the *prima facie* case, along with the reasonable inferences drawn therefrom, coupled with a disbelief of the employer's explanation, can be sufficient to make this finding." *Miller*, 298 F.3d at 1111.

If a plaintiff can introduce affirmative evidence of a discriminatory motive, she may survive summary judgment. *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1249-50 (10th Cir. 2002). "A plaintiff can show pretext by revealing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reason.'" *Id.* (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)). "[E]vidence of pretext may include, but is not limited to, the following: 'prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating . . . criteria); and the use of subjective criteria.'" *Id.* (internal citations omitted).

"Generally, a plaintiff can also show pretext in one of three ways: (1) with evidence that the defendant's stated reasons for adverse employment action were false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff." *Andalam v. TriZetto Grp.*, 2014 WL 1101468, at *4 (D. Colo. Mar. 20, 2014). With respecive to the use of subjective criteria, "[c]ourts view with skepticism subjective evaluation methods" as they provide opportunities for unlawful discrimination. *Garrett*, 305 F.3d at 1218 (collecting authority) (citing *Bell v. Bolger*, 708 F.2d 1312, 1319-20 (8th Cir. 1983) ("subjective promotion procedures are to be closely scrutinized because of their susceptibility to discriminatory abuse").

## B. Plaintiff Has Established A *Prima Facie* Case For Her Race and Sex Discrimination Claims

Defendant concedes that Plaintiff meets the first three elements of her *prima facie* claims for race and sex discrimination. Thus, whether Plaintiff has established her *prima facie* case turns on whether she can show that she was treated less favorably than others not in her protected classes of race and sex. She can.

### 1.   Disparate Treatment Based on Race and Sex.

Evidence supports that Plaintiff was treated less favorably than those similarly situated employees outside of her protected classes. As a preliminary matter, Plaintiff is similarly situated to other GMs, who are white and male.  MMF #52. All of the GMs report to the same manager as Plaintiff and perform the same role of "store manager" as Plaintiff. MMF #10. Because Defendant treated Plaintiff less favorably than other GMs, Plaintiff can establish her *prima facie*

14

case for race and sex discrimination.

Defendant acted contrary to its own employment practice by demoting Plaintiff after six months as opposed to providing Plaintiff with more time to "turn it around" as provided to Mr. Wooten.  PFs #36. In contrast, Mr. Sayers testified that other store managers were demoted only when experiencing a decline in performance after a substantial amount of time. *Id.* Indeed, Defendant gave Mr. Wooten, a white male store manager, two years to improve the profitability of his store. *Id.* Next, Plaintiff was not given adequate inventory to operate her store as compared to the other store managers. PFs #59-61.

Moreover, Defendant demoted Plaintiff based in part on "high charge-offs;" however, Defendant refused to demote or discipline Mr. Wooten and Mr. Sayers at the same time for similar "high charge-offs."  PF #48. In fact, Mr. Sayers' charge-off percentages were worse than Plaintiff's. PF #49. Contrary to the fact that Mr. Sayers and Ms. Rodriguez had to shrink inventory and both were not disciplined, Defendant referenced shrinking as one reason for demoting Plaintiff. PFs #50-52. Additionally, despite the fact that Mr. Sayers missed initially occasionally and Mr. Wooten had a reputation for not following the initial flow process, Mr. Plummer searched for all examples of Ms. Summers' missed initials as a reason for demoting her. PFs #53-56. Further, Defendant demoted Plaintiff in a far more drastic way than other store managers who were demoted for alleged performance issues. PFs #37-43, 64. Defendant provided Plaintiff with three days of training as a store manager as opposed to other store managers who received several weeks of training. PF #27. Ms. Summers was placed in a difficult position; Store #256 was known for its non-performance and she did not receive as much training. PFs #23-27. Plaintiff was demoted to a MT position, not the Assistant Manager

position, and replaced by Mr. Lovett, a white man, even though Mr. Plummer thought Mr. Lovett

was annoying. PF #63, 70-72. Pretty much all the stores were run by white men. PF #73.

Accordingly, Defendant treated Plaintiff less favorably than similarly situated GMs and has

established a *prima facie* case for her race and sex discrimination claims.

     2.  Stereotyping Based on Sex

     Under the fourth prong of the *McDonnell Douglas* framework, Plaintiff must show

circumstances giving rise to an inference of discrimination. "Discrimination because one fails to

act in the way expected of a man or woman is forbidden under Title VII." *Schwenk v. Hartford*,

204 F.3d 1187, 1202 (9th Cir. 2000). Sex stereotyping can violate Title VII when it influences

employment decisions. *Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1038 (8th Cir.

2010) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)). Congress intended to strike at

the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.

*Price Waterhouse,* 490 U.S. at 251. "As the Supreme Court stated, 'we are beyond the day when

an employer could evaluate employees by assuming or insisting that they matched the stereotype

associated with their group[.]'" *Lewis*, 591 F.3d at 1042 (quoting *Price Waterhouse*, 490 U.S. at

251).

     Unlawful stereotyping occurs when circumstances show that an employer drew

assumptions about the plaintiff based on her visible gender non-conformance.  *Prowel v. Wise*

*Bus. Forms, Inc.*, 579 F.3d 285, 292 (3d Cir. 2009) (holding that a reasonable juror could

conclude that plaintiff's termination was based on his sex due to his "effeminate"

characteristics).[1] Although flagrant examples of intentional discrimination still exist,

---

[1] The Tenth Circuit has not addressed the issue of whether sex stereotyping can give rise to discrimination based on

discrimination more often occurs "on a more sophisticated and subtle level" the effects of which are often as cruel and "devastating as the most crude form of discrimination." *Gen. Bldg. Contractors Assoc. v. Pennsylvania*, 458 U.S. 375, 412 (1982). And an employee's sexual orientation does not preclude the employee from bringing a gender stereotyping claim when the employee exhibits gender non-conforming traits.[2] *Prowel*, 579 F.3d at 292. "The touchstone inquiry remains whether circumstances permit a reasonable inference of discrimination." *Lewis*, 591 F.3d at 1040. Thus, based on above case law, circumstances permit a reasonable inference of discrimination when they allow a jury to determine that an employee's gender non-conformance influenced an employer's adverse action -- no matter how subtle.

Here, those circumstances are present. Ms. Summers does not present herself in a feminine manner. PF #13, 15. Mr. Plummer, who played a prominent role in demoting Plaintiff, testified that Plaintiff presents herself more masculine than other female store managers. PF #13. That's true. The other female managers, Ms. Rodriguez and Ms. Guilliaume, appeared in conformance with Mr. Plummer's vision of how a stereotypical woman should look because they had "long hair." PFs #13, 15. Plaintiff's appearance does not conform to traditional expectations of how a woman should look, speak, and act. Ms. Summers does not meet stereotypical gender norms for women. Mr. Sayers, another store manager, testified that she dressed like a "guy would" because she wore loose fitting pants and "basketball shoes." PF #11, 12, 14. In fact, she was often mistaken for a male employee by customers.  PF #12. Mr. Plummer's refusal to acknowledge the extent of Ms. Summers' masculinity creates issues of credibility. PF #15.

---

sex.
[2] Plaintiff is not alleging discrimination based on her sexual orientation, though she is a lesbian. PF #10. Whether Mr. Johnson is gay has no bearing on Plaintiff's discrimination claims based on her sex. Mot. 32 n.8.

Moreover, Mr. Plummer only supervised Plaintiff for six weeks prior to suggesting that she be demoted, despite her prior success in the role. PF #19-20, 22. Mr. Plummer made subjective calls with respect to criticizing Plaintiff based on her leadership abilities and conduct related to alleged charge-offs that turned out to be attributable to Mr. Plummer's predecessor. PF #46-49. Defendant neither investigated nor verified Mr. Plummer's subjective assessment of Plaintiff's alleged performance deficiencies. PF #40, 62, 65-69, 72. While it is true that Defendant quickly promoted Plaintiff, Mr. Plummer was not involved in that promotion decision. PF #17-18.  Nor was he involved in hiring Ms. Summers; he doesn't know why more women are not working in this business. PF #16, 18.

In addition to Defendant's disparate treatment of Plaintiff based on her sex, these circumstances establish a genuine dispute of material fact as to whether the jury can infer that Plaintiff's gender non-conformance traits played a role in her demotion. These inferences include that Plaintiff was not fit for the store manager position because of, at least in part, her masculine appearance.

D. Plaintiff Can Prove Pretext For Both Claims

Defendant's justification for Ms. Summers demotion is not worthy of belief.

First, Defendant is essentially requesting the improper inference that because of the existence of the policy in its handbook stating that discrimination was prohibited, no discrimination could have taken place. Mot. 30; MNF #6. However, the mere existence of an anti-discrimination policy may be undermined by evidence that the employer is not sincerely committed to enforcing the policy. *See Golson v. Green Tree Financial Servicing Corp.*, 26 Fed. Appx. 209 (4th Cir. 2002). Here, Defendant was not sincerely committed to enforcing its policy

as there was no training done regarding equal opportunity laws. PF #1-8. There were no racist or sexist comments from management because it was 2015, and they knew better than to say these things out loud. PF #9. Additionally, Mr. Bohannon had no idea what experience his office manager possessed, although he delegated all human resources duties to her. PF #4.

Ms. Summers was a valued employee until Mr. Plummer minimized her contributions as a GM and demoted her. Defendant argues that because there were two other female GMs it could not have discriminated against Ms. Summers. Mot. 34. This assertion fails to acknowledge all of the facts. Ms. Summers appearance departed from the stereotypical appearance of a woman as she preferred to dress in a traditionally masculine way, while Ms. Rodriguez and Ms. Guilliaume presented themselves femininely.

To justify its disparate treatment of Plaintiff, Defendant attempts to use (1) pre-tax profit; (2) charge-off percentages; and (3) salary. Mot. pp. 24-27. Yet Defendant cherry picks statistics or exercises subjective discretion to contextualize other factors to do so. Thus, Defendants' proffered reasons for demoting Plaintiff are mere pretext for discriminating against her based on her race and sex.

Defendant's reasons for demoting Plaintiff are unworthy of credence and belief. First, Defendant contends Plaintiff's pretax profit margins justified demoting her as opposed to other GMs. This reason is inconsistent and unbelievable. Defendant never emphasized that pretax profit was one method by which it could demote GMs—let alone demote a GM to MT within one year of experiencing a temporary decline in pretax profit. PFs #33-36, 39. Further, Defendant's use of a decline in pre-tax profit margins is subjective. Even though other white GMs sustained declines in pretax profits, Defendant exercised subjective discretion in valuing

Plaintiff's loss as worse and worthy of a drastic demotion after she was given substantially less time to turn around the loss. PF #28-29, 36. Further, at the time of her demotion, as soon as she was no longer understaffed, Plaintiff was improving the profitability of her store, while other locations were losing customers. PFs #30-32, 44-45, 57-58. A jury should be permitted to infer that Defendant's use of pretax profits is unworthy of credence and a subjective ploy to mask unlawful discrimination.

Next, Defendant relies on Plaintiff's "charge-offs" as a reason for why it demoted her. And it justifies its decision to demote her rather than Mr. Sayers because her charge-offs were worse. That's incorrect. Mr. Sayers had charge off percentages that were worse than Plaintiff. PF #49. Yet he was never disciplined or coached for this statistic. *Id.* Defendant's explanation has no basis in fact, and therefore, shows that Defendant's explanation is inconsistent and incoherent at best.

Third, Defendant mischaracterizes Plaintiff's salary at the time of her demotion in connection with the starting salary of Mr. Lovett when he was hired for Plaintiff's position to show that Defendant cannot be "truly biased." Mot. 30 n. 7, PF #21. Defendant's comparison is wrong. To accurately compare salaries between Plaintiff and Mr. Lovett, Defendant should have compared Plaintiff's starting salary when she was hired as a sales manager to that of Mr. Lovett. That comparison demonstrates that Plaintiff, in fact, was paid approximately $3,000 to $5,000 less than Mr. Lovett. Accordingly, Defendant's use of salary comparisons between Plaintiff and Mr. Lovett is unworthy of belief.

Finally, Defendant acted contrary to company practice when it demoted Plaintiff after only six months' of experiencing a decline in some of her performance metrics. PFs #36, 38.

Company practice showed that other white male store managers were given at least two years to improve profitability. *Id.* Plaintiff was afforded less than six months. *Id.* PFs #50-52. Additionally, Defendant acted contrary to company practice by demoting Plaintiff based on initial flow process and shrinking. PFs #50-56. Further, also contrary to company practice, Defendant demoted Plaintiff in a far more drastic way than other store managers who were demoted for similar alleged performance issues. PFs #37-43, 51, 53, 64. Defendant's unequal application of its company practice to Plaintiff should permit a jury to infer that Defendant unlawfully demoted Plaintiff based on her race and sex.

Accordingly, a factfinder considering Plaintiff's *prima facie* case and evidence could infer that Defendant's reasons for demoting Plaintiff were pretextual.

## IV. CONCLUSION

Because Plaintiff is able to carry her burden of proving a *prima facie* case for both her claims of discrimination, and because she has shown a genuine dispute of material fact regarding whether the articulated reason for her demotion is pretextual. Plaintiff respectfully requests that Defendant's Motion for Summary Judgment be denied.

Respectfully submitted this 25th day of September, 2018.

LIVELIHOOD LAW, LLC

By: *s/Rachel E. Ellis*

ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 25ʰ day of September, 2018, I electronically served a copy of the foregoing via electronic mail to the following as indicated below:

Charles L. Bachman, Jr.
49 Atlanta Street
Marietta, GA 30060
Phone: 770-422-1776
Email: cbachman@gregorydoylefirm.com

*Attorney for Defendant*

By: *s/ Amber Klein*
Amber Klein