**IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico**

Case No. 1:17-cv-02132-DDD-MEH

MHARIEL SUMMERS,

    Plaintiff,

v.

GREEN RIVER CORPORATION,

    Defendant.

## ORDER

    This is a case of alleged race and sex employment discrimination in violation of Title VII of the Civil Rights Act of 1964. Following a period of poor profit figures at the television, furniture, and appliances store Plaintiff oversaw, Defendant demoted her from General Manager to Manager Trainee—an act Plaintiff views as motivated by her race and gender. Before the Court is Defendant's motion for summary judgment on both claims. (Motion, Doc. 38; Response, Doc. 44; Reply, Doc. 46.) The Court **GRANTS** the Motion.

## I. UNDISPUTED MATERIAL FACTS[1]

Aaron's, Inc. owns and operates businesses specializing in a variety of products—including televisions, furniture, and appliances. Its franchisees offer affordable payment options to credit-constrained and under-banked customers through a process known as "rent-to-own." Defendant Green River is a franchisee of Aaron's in the Denver, Colorado area owned by Ford Bohannon and Steve Johnson, originally with ten locations. Each store was leanly staffed and run by a General Manager (GM) who was assisted by a Customer Services Manager (CSM) and Sales Manager (SM). Most stores also employed a Manager Trainee (MT). Mr. Johnson, as Regional Manager, and Ian Plummer, as Regional Accounts Manager, oversaw aspects of all locations, including the GMs. Mr. Bohannon generally remained at home in Georgia and relied on Mr. Plummer and Mr. Johnson to ensure no discrimination took place in the stores. Green River claims to be an equal opportunity employer that does not discriminate based on sex or race.

Green River hired Plaintiff Mhariel Summers on August 23, 2013 as an MT at one of its stores. She is an African-American, lesbian female and considers herself to have an unconventionally masculine, "less feminine" appearance. At times, customers would mistake her for a man, and she would generally not correct them. Ms. Summers was paid $11.50 per hour and worked forty-five hours per week. Only weeks after starting, she applied for a promotion to GM. Mr. Johnson,

---

[1] With their briefing on the Motion, the parties have supplied statements of undisputed material facts. Where no objections have been lodged to the facts contained therein, the Court reports the undisputed facts without citation.

who initially interviewed her for the MT position, promoted her to GM of a different store and increased her salary to approximately $45,000 annually. Green River then flew her to Atlanta for three days of training at Aaron's corporate office and paid all her related expenses for the trip. As GM, Ms. Summers felt the historical performance of the store she oversaw was "not bad," but there were areas for improvement: It was smaller than other Green River stores and had been historically difficult to grow.[2] She also felt positive about working under Mr. Johnson. According to her, he was instructive, approachable, direct, patient, and "always seemed to have [her] best interest in mind." Jeff Sayers, another GM, reports that she was well-liked and known as hardworking.[3]

To Green River, pre-tax profit was a very important driving metric and a focus for both Messrs. Bohannon and Johnson.[4] In 2014, while Ms. Summers was a

---

[2] Jeff Sayers, another Green River GM, testified that it was a difficult store to manage and that he had spent three days with Ms. Summers early in her time as GM helping her to reconcile inventory. (Doc. 44-6, at 15:22–16:13.) He further testified that it had never been a performing store, but, other than its size, it wasn't any different than any other Aaron's location. (*Id.* at 17:7–24.)

[3] Green River objects to this fact on the basis of hearsay. However, "[a] reputation among a person's associates or in the community concerning the person's character" is not excluded by the rule against hearsay. Fed. R. Evid. 803(21).

[4] Ms. Summers does not dispute that Green River and Mr. Bohannon were profit-driven, but disputes that "Johnson's focus was on pretax profits" only by saying that "the record does not support this allegation." (*See* Fact 60, Doc. 38, at 13; Doc. 44, at 2.) However, Ms. Summers has not set forth any specific facts addressing Mr. Johnson's testimony that profits were a "very important driver" and the "health of our business." (*See* Doc. 46, at 2 (quoting Johnson Dep. Doc. 42, at 110–14).) Additionally, see the Standard of Review section, *infra.* (noting that specific facts setting forth an issue for trial are required in response to a motion for summary judgement).

3

GM, Green River sold five of its ten stores, and two of the remaining stores were new (having opened in May 2013 and March 2014)—meaning that they were not expected to be making a profit. Moreover, Green River allocates its corporate expenses, such as salaries for regional employees and general accounting and legal fees, across all stores. These circumstances made it important to Green River that existing stores generate profit to offset expected losses. After the sale, the race and gender makeup of the remaining five GMs was Hispanic female; white male; white male; African-American female (Ms. Summers); and white female.

The financial figures at Ms. Summers's store were initially healthy. In the first half of 2014, it made $94,813 in pre-tax profit. She received a $7,000 bonus in May or June of 2014, and Green River increased her salary from $45,000 to $62,000. But in the second half of the year, the store made only $12,264, a decline of 87% (and a 76% drop from the $50,600 pre-tax profit it earned during the same six-month period the year before). She also had losses of $8,652 in October 2014 and $1,465 in December 2014. Seeking potential causes, Mr. Bohannon found there had been a steep increase in charge-offs (or write-offs for bad debt) in Q4 of 2014 at Ms. Summers's store. On October 15, 2014, Mr. Plummer issued her a "Written Counseling" identifying concerns about her not calling customers who were late on their payments. In September and December 2014, the store was short-staffed after Ms. Summers fired several employees. In January 2015, her two key associates, the SM and CSM, both voluntarily departed for different jobs, and both expressed frustrations with Ms. Summers's management. While other GMs also experienced

4

profit decline during late 2014, none were as significant or immediate as what befell Ms. Summers's location. For example, two other stores saw only 44% and 48% reductions from the first half to second half of 2014.

In January 2015, Mr. Plummer's job title changed to Regional Manager, and his interactions with Ms. Summers increased. Messrs. Johnson, Plummer, and Bohannon discussed whether they should terminate Ms. Summers or place her in another position. Mr. Bohannon recognized that her store had become the worst-performing in the Green River franchise. Mr. Johnson felt that the store's declining profitability was due to poor leadership. Messrs. Plummer and Johnson recommended that Green River demote Ms. Summers back to MT at a different store under Jeff Sayers—who she considered to be the best GM in its system—so that she could receive additional training and mentoring. In the end, the three collectively decided to demote her for "poor store performance and leadership deficiencies." In February 2015, Green River replaced her with Jerry Lovett, a white male with twenty-five years of management experience, including overseeing up to 1,500 employees. In the twelve months following Ms. Summers's demotion, the store she used to manage generated pre-tax profits of $178,000.

GM Jeff Sayers has expressed confusion with the decision to demote Ms. Summers. In his opinion, Green River would usually permit a GM's numbers to decline for a substantially longer period before taking such action. He felt that he had seen other people do worse things and get a "slap on the hand" or an only temporary demotion. He opined that other GMs were not disciplined for having high

5

charge-offs[5] and that Ms. Summers was not a substandard employee. He believed her demotion was designed to open the position for Mr. Lovett and to encourage her to quit. He added that Ms. Summers was, in fact, growing the customer count at her store.[6] Mr. Sayers also stated that it "crossed his mind" that Ms. Summers was treated differently because she is a black woman and "pretty much all of our stores [were run by] white males."[7]

On March 25, 2015, Ms. Summers resigned. After filing a charge with the Equal Employment Opportunity Commission, she filed this case on September 5, 2017, alleging race and sex[8] discrimination in violation of Title VII. She admits that, prior to resigning, she never complained to anyone at Green River about discrimination. She now asserts that Mr. Plummer discriminated against her in the

---

[5] However, it is undisputed that during Q4 of 2014, Ms. Summers's write-off percentages were 7.3%, 6.9%, and 4.8%; whereas R.J. Wooten's were 1.5%, 1.5%, and 1.0%; and Mr. Sayers's were -0.02%, 2.68%, and 3.76%. (Doc. 38-1, Ex. A.)

[6] Mr. Sayers's opinions on these matters are generally not supported by data. For example, according to the Store Performance Report, to which Ms. Summers does not object (including on the bases of authenticity or accuracy), she started with 794 customers and ended with 755, a loss. (Doc. 38-1, at 6.)

[7] This too is inaccurate. At the time, three out of Green River's five stores were run by women, one of whom was African American (Ms. Summers) and the other Hispanic.

[8] Ms. Summers claims two forms of sex discrimination. As stated in the Amended Complaint, "Defendant treated male employees more favorably than Ms. Summers. Defendant treated female employees who conformed more closely to sexual stereotypes about how women are expected to present more favorably than Ms. Summers." (Am. Compl. ¶¶ 44–45.) In addition to more traditional claims of sex discrimination, the Tenth Circuit "has implicitly recognized that claims based on the failure to conform to stereotypical gender norms may be viable." *Smith v. Avanti*, 249 F. Supp. 3d 1194, 1200 (D. Colo. 2017) (citing *McBride v. Peak Wellness Ctr., Inc.*, 688 F.3d 698, 711 (10th Cir. 2012); *Potter v. Synerlink Corp.*, 562 F. App'x 665, 674 (10th Cir. 2014)).

demotion process. Her belief is that her masculine presentation makes her not the "conventional woman that conservative individuals are accustomed to . . . having to deal with on a day-to-day basis" in a leadership position. She explained that Mr. Plummer had never done anything to her to make her feel like he did not like her because of her race or gender. She saw him as "a very professional guy" from whom she's "always felt professionalism" and who was never critical of her image. However, she continued:

> Maybe just by the way he carries himself and the fact that there were no -- no other black employees with Green River at the time that I got hired. That is just my assumption that, you know, maybe he didn't have a lot of experience with working with and being in close quarters with -- with a black person or maybe with a black lesbian or with a young black lesbian. You know, I – I'm really the polar opposite of [Mr. Plummer]. So I guess that's why I say what he's accustomed to. I don't know him personally to say who, you know, is in his social circle or anything like that. But just based on what I could gather.[9]

On this basis, Ms. Summers believes Mr. Plummer did not want a "black masculine woman" in a leadership position and decided to demote her.

## II. LEGAL STANDARD

The purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary judgment is appropriate if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). A fact is

---

[9] Summers Dep., Doc. 41, at 137:10–20.

material if it could affect the outcome of the suit under governing law; a dispute of fact is genuine if a rational jury could find for the nonmoving party on the evidence presented. *Id.* If a reasonable juror could not return a verdict for the nonmoving party, summary judgment is proper and there is no need for a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

On a motion for summary judgment, the moving party bears the burden of demonstrating no genuine issue of material fact exists. *Adamson*, 514 F.3d at 1145. Where, as here, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy this burden by demonstrating a lack of evidence for an essential element of the non-movant's claim. *Id.* That is, if a defendant shows entitlement to summary judgment, it becomes a plaintiff's "burden as the non-movant to set forth specific facts demonstrating that there was a genuine issue for trial as to those material matters for which she carried the burden of proof." *Reynolds v. Sch. Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1531 (10th Cir. 1995).

In deciding whether the moving party has carried its burden, courts do not weigh the evidence and instead must view it and draw all reasonable inferences from it in the light most favorable to the non-moving party. *Adamson*, 514 F.3d at 1145. However, neither unsupported conclusory allegations nor mere scintillas of evidence are sufficient to create a genuine dispute of material fact on summary judgment. *Maxey v. Rest. Concepts II, LLC*, 654 F. Supp. 2d 1284, 1291 (D. Colo. 2009). "If a party fails to properly support an assertion of fact or fails to properly

address another party's assertion of fact, a court may . . . consider the fact undisputed for the purposes of the motion." Fed. R. Civ. P. 56(e)(2).

III. ANALYSIS

It is unlawful for employers "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Where, as here, there is no direct evidence of discrimination, cases are evaluated under the three-step burden-shifting test established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that test, a plaintiff must first establish a prima facie case, which a plaintiff does by showing that (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she is qualified for the position at issue, and (4) she was treated less favorably than others not in the protected class. *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) (discrimination case); *Mathews v. Denver Newspaper Agency LLP*, 649 F.3d 1199, 1208 (10th Cir. 2011) (demotion case); *see also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (emphasizing the requirement of the prima facie case is "not onerous" and its purpose is to elucidate "circumstances which give rise to an inference of unlawful discrimination"). If she does so, the burden shifts to the defendant to produce a legitimate, non-discriminatory reason for the adverse employment action. That accomplished, the burden shifts back to the plaintiff to show that the plaintiff's protected status was a determinative factor in the employment decision or that the employer's explanation is pretext. *Id.*; *see*

9

*also Murray v. City of Sapulpa*, 45 F.3d 1417, 1421 (10th Cir. 1995) (noting that the *McDonnell Douglas* burden shifting-analysis is a tool the courts use in Title VII cases that need not be strictly applied, and the ultimate burden of persuasion rests upon the plaintiff).

### A. Prima Facie Case

With regards to Ms. Summers's prima facie case, there is no dispute over the first three prongs. She is a member of relevant protected classes, demotion is an adverse employment action, and she appears qualified to be a GM. The parties disagree over whether, under the fourth prong, she was treated less favorably than any similarly situated white or male counterparts under circumstances that give rise to an inference of discrimination. "An employee is similarly situated to the plaintiff if the employee shares the same supervisor, is subject to the same standards governing performance evaluation and discipline, and has similar relevant employment circumstances, such as work history." *Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1318 (10th Cir. 2017) (finding that having a common supervisor, alone, is insufficient, if a plaintiff mentions no other factors to support comparability); *see also Aramburu v. The Boeing Company*, 112 F.3d 1398, 1404 (10th Cir. 1997) ("A court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated.").

10

At Green River's stores, all of the GMs had the same title, generally the same managerial responsibilities, were overseen by the same individuals, and, at least on the surface, were subject to the same financial performance evaluations. But according to Green River, Ms. Summers could not have been treated less favorably than anyone similarly situated because, all GMs being held to the same standards, her store was unquestionably the worst-performing, and therefore her demotion could not be a function of disfavor, but the result of the application of equal standards to all.[10] Ms. Summers does not dispute this financial data, but responds by arguing that, contrary to Green River's historical practice, she was not given adequate time to remedy her deficient profits, nor was she given adequate inventory to operate her store.[11] She also submits that she matched or bettered the operational practices of her white male peers in several other areas.[12] For these

---

[10] Green River argues that "the decline at Plaintiff's store was twice the decline at other stores and hers was the only store losing money, so she cannot legitimately claim she was similarly situated to Sayers and Wooten." (Doc. 46, at 24.) Thus, Green River suggests that being "similarly situated" could be a function of actual performance. This notion, however, is not consistent with Tenth Circuit law, which understands "similarly situated" in terms of responsibility, job function, title, expectations, and position within the company structure. *See Hiatt*, 858 F.3d at 1318; *see also Aramburu*, 112 F.3d at 1404. So, while two employees with the same performance *expectations* may be similarly situated, that classification is not removed simply because those same two employees do not have the same *actual* performance.

[11] According to Ms. Summers, stores that were more successful received more funding, which allowed those locations to improve their inventory. Stores that were struggling, like hers, were not given the same opportunity. (Doc. 44, at 9.)

[12] For example, Ms. Summers cited reasons for her demotion including "missed initials" and inventory "shrinking" and claimed, based on Mr. Sayers's testimony, that she had fewer problems with these areas than other GMs. (Doc. 44, at 15.)

11

propositions, she almost exclusively relies on the testimony of Jeff Sayers. While his testimony is highly generalized and speculative, taken in the light most favorable to Ms. Summers, it enables her to satisfy her initial prima facie burden enough to "sharpen [the Court's] inquiry" into whether she can prove intentional discrimination. *Texas Dep't of Cmty. Affairs*, 450 U.S. at 256 (explaining that *McDonnell Douglas*'s "creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination").

### B. Race or Sex as a Determinative Factor (Pretext)

To rebut an inference of discrimination with a legitimate, nondiscriminatory reason for its actions, the "defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.* at 254. The plaintiff must then "produce evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006). Importantly, showing the proffered reason to be a pretext is only a tool—albeit a useful one—that assists "the greater enterprise of proving that the real reason was intentional discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 517 (1993).

Here, Green River points to Ms. Summers's poor store performance and leadership deficiencies as its reasons for her demotion, and Ms. Summers provides no rational reason to find these explanations unbelievable. She argues that Green River's reliance on pre-tax profits is pretextual because it had not previously emphasized that metric. Ms. Summers, however, has not disputed the commonsense notion that profits were of primary concern to the leadership of a for-profit entity like Green River, nor has she generally undermined a business's prerogative to maximize profits. The rises and falls in her position and pay grade corollate closely with the profitability of her store.

She was also hired, promoted, and demoted by the same person, Mr. Johnson, within a relatively short time span—a circumstance which gives rise to "a strong inference that the employer's stated reason for acting against the employee is not pretextual." *Antonio*, 458 F.3d at 1183 (joining in the premise recognized in nearly every circuit). Applying the reasoning the Tenth Circuit adopted in *Antonio*, it would make little sense for Mr. Johnson, who hired Ms. Summers fully aware of her race, gender, and appearance, to join in the decision to demote her if his decision could be attributed to those very traits.

Finally, Ms. Summers fails to rebut her superiors' concerns about her leadership, which was marked by high turnover and the stated frustrations of her immediate subordinates. And Ms. Summers's reliance on Mr. Sayers's speculation that she did not have as many charge-offs as other GMs is contrary to the unrebutted evidence, which shows her rates of charge-offs more than tripled that of

her white male peers at the close of 2014. That her store's performance quickly and substantially improved after the new GM was brought in lends credence to Green River's proffered business motivations.

Ms. Summers has not presented evidence of pretext that dispels the inference noted in *Antonio* or Green River's evidence of a bona fide business rationale. Whether she may, at one point, have performed well and earned the praise of her peers and superiors is immaterial if she cannot show discriminatory animus behind the adverse employment decision. At bottom, Ms. Summers has offered no specific facts, beyond conclusory assertions, which a reasonable factfinder could construe as evidence that her race or sex was a determining factor in her demotion. The only person she claims discriminated against her was Mr. Plummer; she has not offered any suggestion that others were motivated by any bias. And she has nothing but praise for Mr. Plummer's professionalism and agreed that he never did or said anything that made her feel like he didn't like her because of her race, gender, or sexual orientation. The subtler discriminatory image that Ms. Summers attempts to cast of him—that he has certain views or beliefs about how women, African-Americans, lesbians, young people, or any other persons in leadership roles should present themselves—does not exist on the record outside of her own speculation. These notions, which she admits are "assumption[s]," raise no genuine dispute that Mr. Plummer, or any other at Green River, had, was motivated by, or acted upon any discriminatory disposition. *See Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988) (a plaintiff's "mere conjecture that their employer's explanation

is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.") (ADEA case). What the record actually suggests is that Green River took a chance in quickly promoting a new employee into a challenging position, and it did not work out. That is unfortunate for all involved, but it is not a violation of Title VII.

## IV. CONCLUSION

For the foregoing reasons, Green River Corporation's Motion (Doc. 38) is **GRANTED**. Ms. Summer's Amended Complaint is **DISMISSED WITH PREJUDICE**. The Clerk shall enter judgment as set forth herein in favor of Green River Corporation and close this case.

Dated: July 2, 2019.

BY THE COURT:

*/s/ Daniel D. Domenico*
Daniel D. Domenico
United States District Judge